**UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **In re:  Roy A. Glenn,** | : | **Chapter 13** |
| | : | |
| | : | **Case No. 25-14427 (PMM)** |
| | : | |
| **Debtor.** | : | |

-------------------------------------------------------------------

# O P I N I O N

## I.  INTRODUCTION

Like most of us, Roy A. Glenn ("Mr. Glenn" or the "Debtor") relies on his car.  Mr. Glenn is a 77 year-old veteran who takes care of his grandchildren and needs his vehicle–a 2017 Nissan Rogue (the "Car")–to commute to doctors' appointments, run errands, and drive his grandkids. The Debtor does not own the Car; he leases it from Ed's Used Car Rental ("Ed's"). The lease requires Mr. Glenn to make a monthly payment to Ed's.

Following the Debtor's filing for chapter 13 bankruptcy protection on October 31, 2025, Mr. Glenn spoke with Ed's, informing it of his bankruptcy filing and discussing the fact that a payment was missed. Notwithstanding this discussion, and as a result of the money owed, Ed's promptly used a remote device (the "Kill Switch") to disable Mr. Glenn's Car.  After learning this, the Debtor's counsel promptly filed an Emergency Motion for Sanctions (doc. #7, the "Motion"). Following an expedited hearing with regard to the Motion, the parties briefed the relevant legal issues, including the question of whether the automatic stay was violated by Ed's and what, if any, damages are merited by the infraction.

For the reasons discussed below, the Court finds that Ed's willfully violated the automatic stay, warranting damages pursuant to 11 U.S.C. §362(k) and established Third Circuit precedent. Further, the Court agrees with the Debtor that the unusual and egregious facts of this case–namely,

that Ed's pattern and practice was to ignore and/or flout the bankruptcy stay–warrant punitive damages.

## II. FINDINGS OF FACT

An evidentiary hearing with regard to the Motion was held and concluded on November 6, 2025. The Debtor and Nella Hutsko (Sales Manager at Ed's) testified at the hearing. Based on the credibility of the witnesses and the plausibility of their testimony, and upon review of the relevant evidence and case docket, the Court makes the following findings of fact.

**Background and History**

1. The Debtor is 77 years old and a disabled veteran. Tr. at 15.

2. The Debtor lives with his daughter and three (3) grandchildren, whom he helps care for. Tr. at 14.

3. Mr. Glenn is a cancer survivor who requires follow-up care. Tr. at 15-16.

4. The Debtor filed for chapter 13 bankruptcy protection on October 31, 2025, and listed Ed's as a creditor on his initial Matrix list of creditors. Tr. at 26.

**The Car**

5. Ed's owns the Car. Tr. at 20.

6. The Debtor signed a lease agreement (the "Lease") for the Car on February 28, 2025 (pre-petition). Tr. at 10, 27, 30.

7. The Lease requires the Debtor to pay on the first of each month and does not provide a grace period for payment. The Lease indicates the Car will be disabled if a payment is missed. Tr. at 41.

8. The Car was previously disabled in June 2025 due to a missed payment. Tr. at 42.

9.   When the petition was filed, the Debtor was up to date on his payments and had possession of the Car. Tr. at 10, 26.

10.  However, the Debtor did not make his November 1, 2025 (post-petition) car payment. Tr. at 30.

11. The Car was turned off by way of the Kill Switch on the morning of November 2, 2025. Tr. at 3, 13, 18, 29-30.

12. On November 4, 2025, the Car was turned back on. Tr. at 4. The Debtor was informed the next morning, November 5, 2025, that the Car was usable again. Tr. at 5, 24.

13.  The Debtor maintains insurance on the Car. Tr. at 13-14, 23, 27.

14.  On November 3, 2025, the Debtor notified Ed's that he was switching to a new insurance company. Tr. at 25-26.

15. The new insurance policy contained an error regarding the name of the lienholder of the Car. Tr. at 60-62.

**Contact between the Debtor and Ed's**

16. On Sunday, November 2, 2025, at around 10:00 a.m. EST, Jalissa Matayka, an employee of Ed's, called the Debtor to inquire as to why Mr. Glenn hadn't made his payment, which was due on November 1, 2025. Tr. at 11, 17, 29.

17. The call was transferred to Ms. Hutsko. Tr. at 31.

18. During this phone call, the Debtor told Ms. Hutsko that he did not make the payments because he "had filed chapter 13 bankruptcy on Friday, the 31st [of October] and that the automatic stay, according to [his] attorney, was now in effect." Tr. at 11-12, 17, 31.

19. Nonetheless, Ms. Hutsko planned to "turn[] the damn car off." Tr. at 22.

3

20. The Debtor did not provide a case number or written proof of his bankruptcy filing to Ed's on November 2, 2025. Tr. at 22, 31. He was unsure of his attorney's name. Id.

21. However, Mr. Glenn assured Ed's that he would provide written proof on Monday morning, the next day and the first weekday following the phone call. Tr. at 22.

22. Ms. Hutsko told the Debtor at that time that "the bankruptcy did not cover" the Car. Tr. at 12, 32. She informed the Debtor that she was going to shut the Car off immediately. Tr. at 17. The Car was, in fact, soon turned off.  See Finding of Fact 11.

23. The next morning, November 3, 2025, at 8:00 a.m., the Debtor called Ed's again and spoke to Ms. Hutsko, who told him that the Car would not be turned on and that this was the Debtor's problem. Tr. at 15. She hung up on the Debtor. Id.

24. The Debtor then phoned his counsel. Tr. at 15.

25. The Car was turned on the next day, November 4, 2025. See Finding of Fact 12.

26. Following the phone calls between Ed's and the Debtor, Debtor's counsel faxed a letter (the "Letter") to Ed's on Monday, November 3, 2025 at 10:33 a.m., confirming that the Debtor had filed for chapter 13 bankruptcy protection. Tr. at 18-19, 32, 50-51; Mot., Ex. A.

27. The Letter requested that the Car be reactivated by noon on Monday, November 3, 2025. Tr. at 32-33.

28.  Ms. Hutsko called the Debtor's counsel on November 3, 2025. Tr. at 42.  Ms. Hutsko indicated during that phone call that "bankruptcy does not apply to this contract." Tr. at 34., 51

29. On November 3, 2025, at 11:30 a.m., Ms. Hutsko emailed the Debtor's counsel suggesting that counsel read the contact between the parties and stating that the Car would remain disabled until instruction from Ed's counsel.  Ed's Exhibit 1.

4

30. Ms. Hutsko told Debtor's counsel that she was represented. Tr. at 43, 46.[1]

31. Later that day, at 1:00 p.m. on November 3, 2025, counsel for the Debtor called Ms. Hutsko. Tr. at 47.

**Consequences**

32.  The day the Car was turned off, the Debtor was unable, as scheduled, to purchase groceries for his grandchildren. Tr. at 14.

33. Prior to the Debtor contacting his counsel, on November 3, 2025, he "stayed up all night long worrying. . ." Tr. at 15.

34. The Debtor was "triggered" by the fact that his Car was turned off. Tr. at 15.

35. The Debtor was forced to rent a vehicle (the "Rental Car") on November 4, 2025, because he needed transportation to get to a medical appointment and to drive his grandchildren. Tr. at 16, 24, 27. He did not know when the Car would be available for use. Tr. at 27.

36. The Rental Car, a Ford Escort, cost $499.00, including a $300.00 deposit. Tr. at 17, 25. The Debtor made the full payment for the Rental Car up front. Tr. at 25.

37. The Debtor did not drive the Car from the time it was reactivated on November 4, 2025, until at least November 6, 2025 (the date of the hearing). Tr. at 48.

---

[1]	Ed's argues that because Debtor's counsel continued communication after she was informed that Ms. Hutsko was represented, the testimony of this witness should be stricken entirely.

Rule 4.2 of the Pennsylvania Rules of Professional Conduct, commonly known as the "No Contact Rule," states "In representing a client, a lawyer shall not communicate about the subject of the representation with a person the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized to do so by law or a court order."  The purpose of Rule 4.2 is to protect attorney-client privilege and prevent possible overreaching by other lawyers. Pa. RPC 4.2, Comment 1.

However, violations of the Rules of Professional Conduct "do not per se give rise to legal actions or render that misconduct actionable." Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz, 602 A.2d 1277, 1279 (Pa. 1992).  In other words, the Pennsylvania Code of Professional Responsibility "does not have the force of substantive law" and generally is not "a basis for altering the rules of law, including evidentiary rules, presumptions and burdens of proof, which would otherwise apply to a case."  In re Thorpe, 755 F. App'x 177, 182 (3d Cir. 2018) (citing In re Estate of Pedrick, 482 A.2d 215, 217 (Pa. 1984)). Ed's cites no law to the contrary.

Thus there is no foundation for Ed's contention that the testimony provided by Ms. Hutsko should be discounted.

### III. THE PARTIES' ARGUMENTS

The Debtor asserts that Ed's violated the automatic stay by initiating the Kill Switch and disabling the Car post-petition. Ed's continued to violate the stay by threatening repossession and failing to turn the Car back on. Tr. at 67. Ed's knew of the bankruptcy–and corresponding stay– on the morning of November 2, 2025. Yet the company continued its enforcement actions, thus willfully violating the stay. The Debtor asserts that these actions merit punitive damages against Ed's.

Ed's, on the other hand, insists that because the Debtor failed to inform it of the bankruptcy *in writing*, the company lacked notice of the filing on Sunday, November 2, 2025. Tr. at 5 (there was "no indication whatsoever of any bankruptcy being filed until after the car was shut off"). Further, Ed's argues that the automatic stay is not applicable to these facts, either because the Car is not property of the estate, Transcript at 6; Response at 1, because Ed's was objectionably reasonable in ignoring the stay, Brief at 8, or because the Debtor breached the contract and broke the law by not maintaining insurance on the Car. Resp't's Br. at 16.

### IV. DISCUSSION

#### A. The Automatic Stay

The automatic stay "applies to a broad range of conduct, but in its most conventional application . . . [it] restrains pending debt collection litigation, thereby furnishing an obvious benefit to the debtor: a 'breathing spell.'" In re Iezzi, 504 B.R. 777, 779 (Bankr. E.D. Pa. 2014) (quoting Maritime Elec. Co. v. United Jersey Bank, 959 F.2d 1194, 1204 (3d Cir. 1991)).

The automatic stay goes into effect at the beginning of a bankruptcy case and is intended to protect property of the estate and allow for an orderly administration of assets. See In re Bolus,

2022 WL 3948685, at *3 (Bankr. M.D. Pa. Aug. 29, 2022).  Further, the stay bars and nullifies post-petition actions in non-bankruptcy cases against the debtor or property of the estate.  See In re Hillis Motors, 997 F.2d 581, 585 (9th Cir. 1993).

The Code gives teeth to this statute; 11 U.S.C. §362(k)(1) provides, in relevant part, that "an individual injured by any willful violation of a stay provided by this section shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages."  In order to establish a claim pursuant to §362(k)(1), the Debtor must show by a preponderance of the evidence that: (1) the creditor violated the automatic stay; (2) the violation of the stay was willful; and (3) the willful violation caused the debtor an injury.  In re Johnson, 601 B.R. 365, 377 (Bankr. E.D. Pa. 2019).  "Willfulness" requires not an intent to violate the stay but rather an intent to commit the act(s) which violate the stay.  In re Lansaw, 853 F.3d 657, 664 n.4 (3d Cir. 2017).

A creditor "willfully" violates the automatic stay under 11 U.S.C. §362(k)(1) when the creditor does so with knowledge of the bankruptcy.  Knowledge of the existence of the bankruptcy case is treated as knowledge of the automatic stay.  In re Shaw, 2025 WL 2264394, at *2 (Bankr. D.N.J. Aug. 7, 2025).  Critically, "a creditor's 'good faith' belief that he is not violating the automatic stay provision is not determinative of willfulness . . . ."  In re Lansdale Fam. Rests., Inc., 977 F.2d 826, 829 (3d Cir. 1992).

## B.  Ed's Willfully Violated the Automatic Stay

Ed's willfully violated the automatic stay.  First, by activating the Kill Switch on the Car post-petition, Ed's "exercise[d] control over property of the estate" in violation of 11 U.S.C.

§362(a)(3).[2]  The Debtor's interest in and right to use the Car is property of the bankruptcy estate. Despite Ed's bold assertion to the contrary,[3] the fact that the Debtor leases rather than owns the Car does not allow the creditor freely to control the vehicle. See In re Atl. Bus. & Cmty. Corp., 901 F.2d 325, 328 (3d Cir. 1990) (a possessory interest in real property is within the ambit of the estate in bankruptcy under Section 541, and thus the protection of the automatic stay of Section 362); In re Printup, 264 B.R. 169 (Bankr. E.D. Tenn. 2001) (Debtor's possessory interest in car she did not own was protected by the automatic stay). Ed's actions were willful; there is no question that the company intended to activate the Kill Switch.  In re Wingard, 382 B.R. 892, 901 (Bankr. W.D. Pa. 2008) (describing a voluntary act as intentional even if the creditor believed it was not violating the stay).  The third element is also satisfied; as discussed in more depth below, the willful violation caused injury to the Debtor.

### C.  Ed's Arguments are Unavailing

Before discussing the extent of the Debtor's damages from the violation, Ed's counter arguments to the conclusion that it violated the automatic stay will be addressed.  Ed's vigorously disputes the analysis outlined above with regard to why its unauthorized exercise of the Kill Switch post-petition is a violation of the automatic stay.  However, Ed's arguments are unpersuasive and indicate the company's misunderstanding of and disrespect for the bankruptcy stay.

---

[2]      The Court agrees with the parties that, because Ed's actions took place post-petition, City of Chicago, Illinois v. Fulton, 592 U.S. 154 (2021) does not control. Fulton teaches that a creditor's retention of property post-petition does not violate the stay; rather, "§362(a)(3) prohibits affirmative acts that would disturb the status quo of estate property as of the time when the bankruptcy petition was filed." Id. at 158.
          One could argue that because the Car was disabled without Ed's knowledge of the bankruptcy, this case presents facts similar to Fulton, i.e. that Ed's was simply maintaining the status quo by leaving the Car off. The parties do not make this (shaky) legal argument and therefore, the Court will not address it.  It is worth noting, however, that the record is not clear with regard to the question of whether the Car was turned off before or following the first phone call from Ed's to the Debtor. Compare Resp. at 2 with Resp't's Br. at 4.

[3]      This assertion was made at the hearing. Ed's Brief, on the other hand, makes the equally bold assertion that because the Debtor did not actually own the Car, his interest in driving it "was not significant." Brief at 7.

### 1.  Standard for a Stay Violation

Ed's contends that §362(k) violations are not governed by Lansaw and Lansdale.  Rather, Ed's insists that Taggart v. Lorenzen, 587 U.S. 554 (2019) controls.  The Taggart Court held that an objectively reasonable standard ("no fair ground of doubt") must be met in order for a bankruptcy court to hold a creditor in civil contempt for violating a discharge order.  Ed's is correct that  the Second Circuit applied Taggart in the context of an asserted stay violation.  See In re Windstream Holdings, Inc., 105 F.4th 488, 494 (2d Cir. 2024).  But Ed's overlooks the critical distinction: Windstream, like Taggart, was decided pursuant to 11 U.S.C. §105, not 11 U.S.C. §362(k) (the relevant statute here).  The two (2) provisions are analyzed differently and provide for distinct relief.  See Taggart, 587 U.S. at 565 (discussing the difference); Windstream, 105 F.4th at 494 (noting that §105, rather than §362(k), applies when sanctioning a corporate debtor, rather than an individual).

The Third Circuit has not altered its §362(k) jurisprudence in light of Taggart.  See In re Aleckna, 13 F.4th 337, 344 n. 37 (3d Cir. 2021); see also In re GYPC, Inc., 634 B.R. 983, 990 (Bankr. S.D. Ohio 2021) (stating that Taggart "declined to determine whether the language in § 362(k)(1) supports the use of a strict liability willfulness standard in the context of an automatic stay violation.").  Thus, Ed's mischaracterizes the standard of review in the Third Circuit with regard to a violation of the automatic stay.[4]

### 2.  Notice Requirement

Ed's also argues that the lack of proper notice of the Debtor's bankruptcy filing absolves the company of liability; "something is warranted which is more substantial than a vague self-

---

[4]    Even if Taggart's "no fair ground of doubt" standard applied, Ed's would not be absolved from liability. The company fails to show an objectionably reasonable basis for ignoring the stay.

9

serving statement by a debtor on a Sunday morning alleging that a bankruptcy has been filed."
Resp't's Br. at 15.

Ed's does not dispute that it received notice of the bankruptcy filing; the company admits that the Debtor told Ed's employee on the morning of November 2, 2025.  Rather, the argument is more subtle: Ed's asserts that although the Debtor noticed the company, Mr. Glenn's confusion about the process and ignorance of relevant information made the assertion incredible.  In other words, because Ed's doubted the truth of the Debtor's pronouncement, the company asserts that it was free to ignore the law.

By making this assumption, Ed's mistreated its customer and violated the law. According to the leading bankruptcy treatise:

> The stay is effective automatically and immediately upon the filing of a bankruptcy petition, whether voluntary, joint or involuntary. Formal service of process is not required, and **no particular notice need be given in order to subject a party to the stay.**

3 Collier on Bankruptcy P 362.02 (16th Ed. 2026) (emphasis added).  See also In re Edgewater Constr. Grp., Inc., 653 B.R. 221, 227 (Bankr. S.D. Fla. 2023) ("The law is very clear that once a party has notice that a bankruptcy has been filed, that party cannot just ignore that information until receiving the information in the form that party would like to have it."); In re Docherty, 2016 WL 675835, at *5 (Bankr. N.D. Ohio Feb. 18, 2016) (deeming "an oral notification of a bankruptcy filing sufficient" and noting that it is the *creditor's burden* to inquire further); In re Warren, 532 B.R. 655, 662 (Bankr. D.S.C. 2015) (telephone call from roommate and lawyer amounted to actual notice); In re Franklin, 614 B.R. 534, 545 (Bankr. M.D.N.C. 2020) ("Being advised of the filing of a bankruptcy case *in any form* places a creditor on notice of the bankruptcy filing. Upon being advised, even informally, of the bankruptcy case, the creditor is on notice of the bankruptcy)

(emphasis in original); In re Freemyer Indus. Pressure, Inc., 281 B.R. 262, 267 (Bankr. N.D. Tex. 2002) (citing cases about a creditor's affirmative duty to inquire further once receiving oral notice).

The two (2) cases relied on by Ed's in support of its contention that the company was free to disbelieve Mr. Glenn – each of which was decided more than thirty-five (35) years ago – are inapposite. Neither stands for the proposition that written, detailed notice of a bankruptcy filing must be provided in order for the stay to take effect. See In re McLaughlin, 96 B.R. 554 (Bankr. E.D. Pa. 1989) (decided prior to the enactment of §362(k) and failing to discuss notice requirement); Gen. Motors Acceptance Corp. v. Miller, 10 B.R. 74, 75 (Bankr. S.D. Ohio 1981) (decided prior to the enactment of §362(k) and holding that a call by the debtor's wife who could not recall the date or details of the phone call was "too tenuous" to trigger a duty by the creditor.).[5]

### 3. **Effect of Possible Unrelated Infractions**

Moreover, Ed's argues that it need not respect the automatic stay because the Car was uninsured, which is a violation of Pennsylvania law. There are at least two (2) problems with this argument. First, Ed's assumes facts not in evidence, namely that the Car lacked insurance. See Finding of Fact 13 (determining that the Car was insured). Second, even if the Car was uninsured, Ed's cites no legal authority for the bold proposition that a Debtor's failure to maintain auto insurance allows a creditor to violate the automatic stay by disabling the vehicle. The law is to the contrary:

> A creditor's good faith belief that it was not violating the stay is not relevant in determining whether there has been a stay violation. . . There is no exception in § 362 for property that a creditor unilaterally decides to exclude from protection of the automatic stay or for a creditor that decides to repossess property because it believes (correctly or incorrectly) that the insurance has lapsed.

---

[5]    To the extent that there is case law to the contrary, see In re Collier, 410 B.R. 464, 472 (Bankr. E.D. Tex. 2009) (creditor can only be expected to respect stay once it receives written confirmation of the filing), the Court declines to follow that line of reasoning.

11

In re Weathers, 670 B.R. 20, 34 (Bankr. D.S.C. 2025) (citation omitted) (holding that there is no exception to the stay or for a creditor that decides to repossess property because it believes, correctly or incorrectly, that the insurance has lapsed).  See also In re Scungio Borst & Assocs., LLC, 652 B.R. 644, 652 (Bankr. E.D. Pa. 2023) ("A good faith mistake of law or dispute as to the creditor's right to take the action does not negate the willfulness of the violation.").

### D.  Damages

#### 1.  Actual Damages

Ed's violation of the stay caused harm to Mr. Glenn; the Code requires compensation for such damages.  11 U.S.C. §362(k) (an injured debtor "*shall* recover actual damages") (emphasis added).  A Plaintiff who seeks compensation for a stay violation must prove actual damages with reasonable certainty and bears the burden of proving all aspects of his actual damages claim.  In re Vu, 591 B.R. 596, 604 (Bankr. E.D. Pa. 2018); In re Johnson, 601 B.R. at  378-79.

The Debtor will be awarded $4,179.00 in actual damages. This amount is derived from the $499.00 the Debtor spent for a rental car following Ed's disabling of his vehicle, see Findings of Fact 35 and 36, plus the $3,680.00 spent on attorney's fees. See doc. #15.  The Court considers each of these expenses to be both necessary and reasonable.  In fact, if the Debtor had not taken steps to rent a car and prosecute his rights, the actual damage may have been more extensive.[6]

#### 2.  Punitive Damages

The Debtor also seeks punitive damages.  The Court agrees that the nature and extent of the stay violation merit the award of punitive damages.  In a recent Opinion, this Court held that the public rights exception to the Seventh Amendment guaranty applies and allows a bankruptcy

---

[6]      Although the Debtor mentions in his Motion that he suffered emotional distress damages, no evidence to support this conclusion was provided. Thus, damages for emotional distress will not be awarded.

12

court to impose punitive damages with regard to a violation of the automatic stay under 11 U.S.C.

§362(k):

> [T]he public rights exception enables Congress to entrust Bankruptcy Courts with applying and enforcing the automatic stay, a foundational bankruptcy right. . . . The statutory, rather than common law, nature of § 362(k) means that . . . the public rights exception to the Seventh Amendment applies. . . . Enforcement of the automatic stay . . . is not a legal issue that arises out of or in connection with the bankruptcy . . . . The stay is not ancillary or adjacent to bankruptcy; the provision is central, insuring breathing room so that an orderly and efficient distribution—the purpose of the Code—can take place.

In re Minarik, 675 B.R. 158, 170–71(Bankr. E.D. Pa. 2025) (citations omitted).  However, this

Court further found in Minarik that punitive damages, although possible, were not warranted by

the facts of that case.

In contrast, the facts here rise to the level of an egregious violation of the automatic stay,

calling for the unusual step of imposing punitive damages against Ed's in the amount of

$25,000.00.  This decision is not reached lightly and comes after careful consideration of the

relevant law and demonstrated facts.

Punitive damages are usually awarded in order to punish and deter the offending conduct.

In re Dean, 490 B.R. 662, 671 (Bankr. M.D. Pa. 2013); In re Johnson, 601 B.R. 365, 382 (Bankr.

E.D. Pa. 2019).  A court should consider the following factors when contemplating an award of

punitive damages under §362(k)(1): "(1) the nature of the [Respondent's] conduct; (2) the

[Defendant's] ability to pay; (3) the [Defendant's] motives; and (4) any provocation by the debtor."

In re Vu, 591 B.R. at 607.  Such damages are appropriate only in cases in which the stay violation

was "reprehensible" and "egregious."  In re Lansaw, 853 F.3d at 669, 671.  Whether to assess

punitive damages lies in the discretion of the Court.  In re Laskaratos, 605 B.R. at 300.  Punitive

damages are warranted here for at least three (3) reasons, each of which demonstrates the severity

of the infraction.

13

First, the record shows that Ed's maintains a longstanding practice of ignorance and/or

defiance of the automatic stay. Ms. Hutsko, who has worked as a manager at Ed's for twenty-eight

(28) years, testified:

> Q: So, are you saying that you did not think the bankruptcy applied to your car because you have the title?
>
> A: To my knowledge, I've never had a case where it did.

Tr. at 32; see also Tr. at 34; Finding of Fact 22 (Ms. Hutsko acknowledging the belief that the

"bankruptcy does not apply to this contract"); Tr. at 39 ("I have never had someone actively have

a bankruptcy and keep the car and not pay"); Tr. at 55-56 (discussion of the fact that Ed's standard

contract provides that bankruptcy amounts to an event of default and allows repossession of the

vehicle); Tr. at 70-71 (turning off the car is Ed's routine practice); Finding of Fact 19 (Ed's letting

the Debtor know that the "damn car" would be turned off).

Ed's thus readily admits that in the past *nearly three (3) decades* of leasing cars

(presumably mostly to lower income individuals), the company's course of performance has not

been altered one bit by the protections afforded to consumers in the Bankruptcy Code.  To the

contrary, Ed's baldly asserts that it is – somehow –exempt from the federal Bankruptcy Code.  This

belief arises either from Ed's willful, ostrich-like ignorance or a conscious disregard for the rights

of its customers, either of which is punishable.

In a case with similar facts, in which a car dealership activated the "kill switch" on a

debtor's vehicle post-petition and after being notified of the bankruptcy, the court commented:

> This case reflects egregious and contumacious violations of the automatic stay by a creditor that **either badly misjudged the consequences of its actions, or does not care.** Its actions demonstrate a disdain for the financially vulnerable customers it purports to serve and an utter disregard for the automatic stay. . . .  [The creditor] has shown no contrition, remorse, or comprehension of the severity of its actions. This lack of contrition portends that similar violations will continue in the absence of sufficient deterrence.

<u>In re Franklin</u>, 614 B.R. 534, 540, 550 (Bankr. M.D.N.C. 2020) (emphasis added).  Similarly, here, at no point in this process has Ed's expressed contrition or remorse with regard to the fact that it willfully violated the automatic stay and ignored the law which this Court must uphold.

Second, echoing the "disdain" noted by the <u>Franklin</u> court, after being put on legal notice by the Debtor of his filing, Ed's knee-jerk assumption was that Mr. Glenn was lying. Ms. Hutsko testified that:

> I've had many people over the years tell me they filed for bankruptcy. They don't follow through with it. **It's an excuse** not to pay until I get the paperwork, but I have never had someone actively have a bankruptcy and keep the car and not pay.

Tr. at 39 (emphasis added); <u>see also</u> Tr. at 69 ("A lot of people say they're filing, and they're not," the Debtor provided "every excuse under the sun" for why he didn't have proof of his filing). While the Code does not precisely require that customers be treated with respect, the legal assumption must be that the stay is in effect rather than the opposite.  And, consequently, the Code requires the cessation of collection efforts upon learning of such a filing, rather than proceeding until strict proof is provided.  Assuming that one's customers are trying to game the system, rather than presuming them to be good faith debtors, indicates not just contempt for those individuals, but a disregard for the law that protects them.  The testimony and pleadings offered by Ed's, rather than indicating remorse at having harmed the Debtor, demonstrate egregious disregard for the legal ramifications of the Bankruptcy Code.

Third, and related to the reasons just discussed, Ed's fails to appreciate that the risk of assuming that customers are lying about a bankruptcy filing is greater than the risk of assuming the truth of that statement.  Upon receiving verbal notice on a Sunday morning that Mr. Glenn had filed for bankruptcy protection, Ed's faced the choice of whether to cease its actions or to proceed. Leaving the car on would have left Ed's at risk for allowing a non-debtor customer to continue to

15

drive (at least temporarily) without paying.  Turning the car off, on the other hand, placed Ed's at risk for violating the automatic stay and being subject to the penalties now being imposed.  That Ed's chose the latter option rather than the former reveals a profound "deficiency" in the company's bankruptcy procedure. <u>Franklin</u>, 614 B.R. at 550. Section 362 of the Code demands immediate and strict stay of collection actions.  Creditors do not have wiggle room.  The fact that Ed's tosses the dice on whether it proceeds with collection enforcement – rather than ceasing such actions upon indication that the stay is in place – places additional risks and burdens on debtors.

### 3.  **Amount of Punitive Damages**

After careful consideration, the Court will exercise its discretion and impose punitive damages in the amount of $25,000.00, an amount meant to punish Ed's faulty practices and deter continuation of the same.  This award is determined after consideration of "three guideposts: (1) the degree of reprehensibility of the creditor's conduct; (2) the ratio between punitive and compensatory damages; and (3) the amount of punitive damages awarded in other comparable cases as compared to the actual damages suffered in such cases." <u>In re Franklin</u>, 614 B.R. 534, 550 (Bankr. M.D.N.C. 2020) (internal quotations and citations omitted) (noting that multiplier wasn't relevant in this case with low actual damages).

The first prong – the degree of reprehensibility – is most informative here.  Ed's contracted with the Debtor, a seventy-seven-year-old veteran, for use of an old, unfancy car worth $13,500.00.[7]  The contract is a "lease to own" agreement, for which the Debtor, a low-income individual with less than stellar credit, will pay a total amount of about $25,000.00. <u>See</u> Schedules E/F, G.  Making a profit by leasing cars to bankrupt veterans is not illegal.  However, Ed's

---

[7]    The lease contract is not in evidence and the Debtor's schedules are unclear with regard to the monthly payments to Ed's (given that the Debtor has a second vehicle).

eagerness to disable the vehicle and willingness to flout established law in order to collect a monthly payment indicates that the company must be made aware that its practices are predatory. See In re Weathers, 670 B.R. 20, 39-40 (Bankr. D.S.C. 2025) (punitive damage award was necessary in order to motivate creditor to correct the deficiencies in its bankruptcy procedure).

Consideration of the second prong of the test outlined above – the ratio between actual and punitive damages – supports the award. The amount of punitive damages ($25,000.00) is around six (6) times the amount of actual damages awarded (a little over $4,000.00)[8]. Such a single digit multiplier is not uncommon. In re Johnson, 601 B.R. 365, 383 (Bankr. E.D. Pa. 2019). In fact, the Supreme Court has approved of single-digit multipliers as "more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with [higher] ratios." State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408, 425 (2003) (pointing out that higher multipliers of punitive damage awards are appropriate where actual damages are low); see also McGinnis v. Am. Home Mortg. Servicing, Inc., 901 F.3d 1282, 1290 (11th Cir. 2018).

Prong three (3) is also satisfied; the amount of punitive damages awarded is in line with comparable cases. See In re Lansaw, 853 F.3d at 671 (affirming punitive damage award four (4) times the amount of actual damages); Franklin, 614 B.R. at 551-52 (surveying cases and awarding $15,000.00 in punitive damages despite the near absence of actual damages); In re Henderson, 2026 WL 74742, at *1 (Bankr. E.D.N.Y. Jan. 9, 2026) (awarding punitive damages four (4) times the amount of actual damages); In re U Lock, Inc., 663 B.R. 30, 56 (Bankr. W.D. Pa. 2024) (awarding $15,000.00 in punitive damages, twice as much as actual damages); In re Johnson, 601

---

[8] The amount of actual damages here is small. If counsel had not been persistent in immediately asserting Debtor's rights, and or if the Debtor had presented evidence of emotional distress, it may well have been significantly higher.

17

B.R. 365, 370 (Bankr. E.D. Pa. 2019) (awarding $20,000.00 in punitive damages where actual damages were approximately the same amount).

In sum, the punitive damages awarded to the Debtor are reasonable and appropriate.

## V.  CONCLUSION

Roy Glenn's car was disabled by his lender, making it inoperable for about two (2) days, which is arguably not a big deal. However, remedying this post-petition infraction took many phone calls and emails, the filing and briefing of a motion, and an expedited evidentiary hearing at which the Debtor was forced to recount the disruption and resulting distress.  That is a big deal and one which the protections afforded to bankruptcy debtors are specifically designed to avoid.

Because Ed's failed to appreciate the existence and meaning of those protections and instead chose to assume and act on the false assumption that the borrower was irresponsible and untrustworthy, the company violated the rights of this Debtor.  Further, evidence that the violation indicates a pattern of egregious practice causes this Court to find that both actual and punitive damages are warranted.

An appropriate order will follow.

**Date:**  April 9, 2026

**PATRICIA M. MAYER**
**U.S. BANKRUPTCY JUDGE**